602 S.E.2d 738

**Herman Henry "Bud" VON DOHLEN, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 25861.

Supreme Court of South Carolina.

Heard June 9, 2004.
Decided Aug. 30, 2004.
Rehearing Denied Oct. 6, 2004.

600

Teresa L. Norris, of the Center for Capital Litigation, of Columbia; Jeffrey P. Bloom, of Columbia; and Acting Chief Attorney Joseph L. Savitz, III, of the South Carolina Office of Appellate Defense, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, for Respondent.

Justice BURNETT:

We granted the petition for a writ of certiorari from Herman Henry "Bud" Von Dohlen (Petitioner) to consider whether the post-conviction relief (PCR) judge erred in denying Petitioner's request for a new sentencing proceeding. We reverse and grant Petitioner a new sentencing proceeding.

## FACTUAL AND PROCEDURAL HISTORY

Petitioner, then age 35, averred in a signed confession to law enforcement investigators that he walked from the Berkeley County pawnshop he managed to a nearby dry cleaning shop to ask for change the morning of May 28, 1990. He stated shop employee Margaret McLean (Victim) refused to give him change and told him his brother, who recently had been murdered, deserved to die.

Petitioner returned to the pawnshop, loaded a rifle, and walked back to the shop. He stated he intended only to scare Victim for her alleged cruel and thoughtless comments. He forced Victim to disrobe to make the crime appear to be a rape. He stated the rifle discharged accidentally when Victim ran and caused a bar bolting the back door to strike Victim and the gun. Petitioner then shot Victim in the back of the head and decided to steal money from the store in order to make it appear to be a robbery.

The jury convicted Petitioner of murder and armed robbery, and recommended a sentence of death based on the aggravating circumstance of armed robbery. *See* S.C.Code Ann. §§ 16–3–20(A) and 16–3–20(C)(a)(1)(d) (Supp.1991). The trial judge sentenced Petitioner to death for murder on the jury's recommendation and twenty-five years for armed robbery. The convictions and sentences were affirmed on direct appeal. *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996).

Petitioner filed a PCR application in 1997 and later amended it. The PCR judge denied the application after a hearing in 1999. We granted a writ of certiorari to consider two questions raised by Petitioner:

I. Does any evidence of probative value support the PCR judge's ruling that Petitioner's trial attorneys were not ineffective in failing to adequately prepare and present

evidence during the penalty phase of the trial that Petitioner suffered from a major mental illness at the time of the murder?

II. Does any evidence of probative value support the PCR judge's ruling that Petitioner's trial attorneys were not ineffective in failing to object to the prosecutor's closing argument during the penalty phase of the trial that jurors should put themselves in Victim's shoes?

## DISCUSSION

■■■■■ A defendant has the right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions in the case. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *Cherry v. State,* 300 S.C. 115, 386 S.E.2d 624 (1989). In order to prove counsel was ineffective, the applicant must show that counsel's performance was deficient and that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland,* 466 U.S. at 687–694, 104 S.Ct. at 2064–2068, 80 L.Ed.2d at 693–698; *Rhodes v. State,* 349 S.C. 25, 561 S.E.2d 606 (2002); *Johnson v. State,* 325 S.C. 182, 480 S.E.2d 733 (1997). Thus, an applicant must show both error and prejudice to be granted relief in a PCR proceeding. *Strickland, supra; Scott v. State,* 334 S.C. 248, 513 S.E.2d 100 (1999).

■■■■■ The burden is on the applicant in a post-conviction proceeding to prove the allegations in his application. *Butler v. State,* 286 S.C. 441, 334 S.E.2d 813 (1985). An appellate court may affirm the PCR court's decision when its findings are supported by any evidence of probative value in the record. *Cherry, supra.* However, an appellate court will not affirm the decision when it is not supported by any probative evidence. *Holland v. State,* 322 S.C. 111, 470 S.E.2d 378 (1996).

## I. EXPERT TESTIMONY ABOUT PETITIONER'S MAJOR MENTAL ILLNESS

During the penalty phase of the trial, witnesses testified Petitioner had been a good husband, married for seventeen years; a good father, with four children ages two through fourteen; and a dependable, likeable employee of grocery stores and pawnshops. Petitioner grew up in a very poor family and had been physically abused and emotionally neglected as a child. He had no prior criminal record. The violent murder was completely unexpected and out of character for a man who had never displayed violent tendencies.

Witnesses testified Petitioner's personality and demeanor underwent a dramatic change when—about two weeks before Victim's murder—Petitioner's brother was murdered by the brother's father-in-law. Petitioner became withdrawn, irritable, and depressed. He began abusing alcohol and Valium, an anti-anxiety medication.

At trial during the penalty phase, Dr. Michael Lampkin, a psychiatrist, testified Petitioner at the time of the murder suffered from "adjustment reaction with mixed features of emotions and conduct," as well as pathological intoxication from the abuse of alcohol and Valium. Adjustment reaction is a disorder in which a person's expression of grief exceeds what is normally expected. It is generally easily treatable and lasts no longer than three months. On cross-examination, Lampkin testified Petitioner did not have a chronic mental illness and did not dispute the solicitor's assertion that adjustment reaction disorder was "pretty small potatoes" in the spectrum of mental illnesses.

In the penalty phase closing arguments, the solicitor argued Petitioner did not suffer from any mental or emotional disturbance and that the murder was committed in "cold premeditation." The solicitor contended, "His brother Bill dying, a less than perfect childhood, vagaries, ups and downs of life that we all suffer. His own witness, Dr. Lampkin, said adjustment reaction as he called it, the stress. Divorce could bring it on, business problems can bring it on. These are things every person goes through. He could provide not one bit of excuse."

At the PCR hearing, Lampkin testified that if he had been provided with additional medical and psychiatric records that

existed and were available before the trial, he would have diagnosed Petitioner as suffering at the time of the murder from "major depressive episodes with severe symptoms of anxiety and possible prepsychotic features," plus alcohol and Valium abuse.

Dr. Lampkin identified six items that changed his opinion: (1) the MMPI test [1] administered to Petitioner in 1990 while at the William S. Hall Psychiatric Institute, a state hospital; (2) Petitioner's complete medical record from his four months at the Hall Institute, including nurses' notes with numerous references to Petitioner's depressed state, impaired memory, isolation, and hopelessness; (3) the medical records of Petitioner's father indicating he suffered from chronic depression and thus providing a genetic basis for Petitioner's chronic depression; (4) the medical records of Petitioner's brother, John, who attempted suicide shortly before Petitioner's trial, providing additional proof of a genetic predisposition for mental disorders; (5) an MCMI test [2] administered to Petitioner in 1990 by Dr. Harold Morgan at the Hall Institute, revealing elevated scores for anxiety, depression, and delusional disorders; and (6) Petitioner's records prepared in 1990 by Dr. Don Hinnant, a psychologist, which revealed symptoms of major depression. All the records were potentially available to Petitioner's attorneys and expert witnesses before his trial in 1991.

Louisa Storen, a social worker who testified at trial about Petitioner's background and family, testified at the PCR hearing she asked Lampkin to review Petitioner's case shortly before trial to ensure she had not overlooked important issues. Storen provided a mostly oral summary of Petitioner's medical records and background to Lampkin. Storen did not expect Lampkin to testify at trial and, in a meeting lasting no more than thirty minutes, "what I remember was talking very fast, telegraphically trying to give him a bunch of information in a short period of time before he saw [Petitioner]."

---

1. The MMPI is the Minnesota Multiphasic Inventory, a psychological test used for more than fifty years.

2. The MCMI is the Millon Clinical Multiaxial Inventory report, a standard psychological test.

At the PCR hearing, Dr. John DeWitt, a forensic psychiatrist, testified he treated Petitioner for 3½ years beginning in August 1991, examining Petitioner fifty-two times. Petitioner suffered from a major mental illness at the time of Victim's murder—severe depression with psychotic and suicidal tendencies. Petitioner's mental condition in May 1990 was far more serious than the usually short-lived adjustment reaction disorder with which he was diagnosed.

Further, DeWitt testified Petitioner's severe depression was a condition to which he was predisposed by a family history of mental illness and alcohol or drug abuse, as well as a physically abusive childhood. The condition likely began in earnest when Petitioner was diagnosed with cancer in the 1980s. It was exacerbated by the suicide of his father in 1981, the murder of his brother two weeks before Victim's murder, and Petitioner's attempts at self-medication with alcohol and Valium. Severe depression can cause unpredictable, irrational, and chaotic behavior in people who never have exhibited such behavior, with personality and lifestyle changes so drastic it is "almost as if they had a brain transplant." Petitioner suffered a mental or emotional disturbance at the time of Victim's murder, and due to his altered mental state "[the murder] was not a volitional thing but out of his conscious awareness or control."

 Petitioner contends his trial attorneys were ineffective in failing to adequately prepare and present evidence in the penalty phase of the trial that he suffered from severe, chronic depression, a major mental illness, at the time of the murder. The attorneys failed to provide to Lampkin medical records and relevant information that existed before trial. If they had done so, Lampkin would have reached the proper diagnosis and been able to correctly explain to jurors Petitioner's mental state and inability to control his actions on the date of the murder. There is a reasonable probability this information could prompt the jury to recommend a sentence of life in prison rather than death. Petitioner relies in part on *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

The State contends the PCR judge correctly denied relief to Petitioner because his trial attorneys' investigation and preparation of evidence on Petitioner's mental state were sufficient

to meet the *Strickland* standard. The State asserts Petitioner's attorneys presented extensive evidence of his mental and psychological state, distinguishing this case from *Wiggins, supra.*

We conclude Petitioner's case is sufficiently analogous to *Wiggins* to rely on it in reaching our decision, although counsel in Petitioner's case was more diligent than counsel in *Wiggins* in presenting an accurate picture of Petitioner's mental state. In *Wiggins*, the United States Supreme Court found the defendant's attorneys in a capital case were ineffective in failing to expand their investigation of the defendant's background beyond cursory reports in order to present compelling mitigating evidence on the defendant's behalf during the penalty phase of the trial. An adequate investigation would have revealed crucial facts about the defendant's "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," the "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," the time he spent homeless, and his diminished mental capacity. *Wiggins*, 539 U.S. at 535, 123 S.Ct. at 2542, 156 L.Ed.2d at 493.

■ While *Strickland* does not require counsel investigate every conceivable line of mitigating evidence or require the submission of such evidence in every case, "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgment support the limitations on investigation.... A decision not to investigate thus must be directly assessed for reasonableness in all the circumstances." *Wiggins*, 539 U.S. at 533, 123 S.Ct. at 2541, 156 L.Ed.2d at 492 (quoting *Strickland, supra*). The Supreme Court held the defendant had proven prejudice because there is a reasonable probability at least one juror would have struck a different balance and returned with a different sentence had the jury been confronted with the considerable mitigating evidence. *Id.* at 536, 123 S.Ct. at 2543, 156 L.Ed.2d at 495; *see also Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (defendant's attorneys were ineffective in failing to investigate and present substantial mitigating evidence during penalty phase of capital case, including description of abuse and neglect during defendant's early childhood and testimony he was borderline men-

tally retarded; counsel's error prejudiced defendant because omitted evidence might have influenced jury's appraisal of defendant's moral culpability).

Petitioner has proved error and prejudice under the *Strickland* standard. Petitioner has demonstrated his attorneys erred in failing to adequately investigate and prepare expert testimony about his mental condition as it existed at the time of the murder. While the attorneys exerted some effort, according to the testimony of Lampkin and DeWitt at the PCR hearing, it was insufficient. The absence of crucial medical records and related information which existed at the time of Petitioner's trial prevented Lampkin from conveying an accurate diagnosis and explanation of Petitioner's mental condition to the sentencing jury.

Furthermore, Petitioner has shown prejudice. There is a reasonable probability the outcome of the trial might have been different had the jury heard the available information about Petitioner's mental condition as it existed at the time of the murder. The PCR judge's decision is not supported by evidence of probative value.

## II. SOLICITOR'S CLOSING ARGUMENT

The black tennis shoes Victim wore on the day of the murder were entered into evidence and identified by two witnesses. The solicitor mentioned Victim's shoes four times during his closing argument in the guilt phase of the trial.[3]

During closing arguments in the penalty phase, the solicitor expanded on the same theme and explicitly urged jurors to "put yourself in Margaret's shoes, size six." At the PCR hearing, Petitioner's sister testified the solicitor cried while holding up one of Victim's shoes during his closing argument in the penalty phase, telling jurors "to put themselves in her shoes." One of Petitioner's trial attorneys testified he did not recall that particular statement or the solicitor crying, but he may have been distracted and failed to

---

3. "This Defendant forces her at this gun point to take off her shirt, her underwear, her pants and her shoes." "You'll have Margaret's shoes back there" in the jury room. "Her shoes taken off of her, a small size seven shoes—small woman, and this Defendant had her where he wanted her. . . ." "You can hear her through her shoes."

notice it. Petitioner's attorneys did not identify any strategic reason for not objecting to the arguments.

Petitioner contends his trial attorneys were constitutionally ineffective in failing to object to the solicitor's argument that jurors should "put yourself in Margaret's shoes, size six." The solicitor's statements constitute a prohibited form of argument sometimes described as a "golden rule argument," in which jurors are urged to place themselves in the position of a party, a victim, or a victim's family member and decide the case from that perspective. Petitioner asserts the effect of such an argument is potentially to cause jurors to decide a case based on passion and prejudice instead of a reasoned, impartial consideration of evidence presented to them.

The State asserts the PCR judge correctly denied relief because a golden rule argument is permissible during the penalty phase of a capital case in light of *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The State contends *Payne* allows the jury to consider victim impact evidence; therefore, it is proper to allow the prosecutor during the penalty phase to invite jurors to place themselves in the victim's position, provided the invitation is grounded in the circumstances of the crime.[4] The State contends Petitioner has failed to show that statement was sufficiently prejudicial to warrant relief.

A review of a solicitor's closing argument is based upon the standard of whether his comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *State v. Caldwell*, 300 S.C. 494, 504, 388 S.E.2d 816, 822 (1990). A solicitor's closing argument must be carefully tailored so as not to appeal to the personal biases of the jury. *State v. Copeland*, 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996); *State v. Linder*, 276 S.C. 304, 278 S.E.2d 335 (1981). The argument must not be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences that may be

4. Petitioner in his reply brief correctly notes *Payne* was decided June 27, 1991, one month after Petitioner's trial. Victim impact arguments were improper at the time of Petitioner's trial, and the solicitor could not have been relying on *Payne* in making his arguments. Petitioner does not dispute that *Payne's* holdings apply in his case.

drawn therefrom. *Simmons v. State,* 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998); *Copeland,* 321 S.C. at 324, 468 S.E.2d at 624.

In *State v. White,* 246 S.C. 502, 144 S.E.2d 481 (1965), the defendant faced the death penalty for rape. The solicitor argued in closing:

> How would you like to see him coming in your bedroom or your daughter's bedroom with this butcher knife? ... I don't know whether you have got daughters or not, I believe one or two of you are not married. But everybody has got a mother. Not everybody, but most everybody has got a sister, daughters. Let him go, let him come back to Williamsburg County. Let him come in your wife's bedroom or your mother or daughters, any of them, what would you do? ... How, if this young lady was your sister, how would you feel? How, if she was your wife, how would you feel? How, if she was your daughter, God only knows, how would you feel? Gentlemen, she is all of that to somebody. She is a daughter, she is a sister, she is a wife. And but for the grace of God that could be your sister, your daughter or your wife.... But when you get back there and consider giving him mercy like they are going to ask you for, think about your wife, think about your daughters, think about your sister or your mother, being in the same position as this young lady, with a knife at her throat and a brute on top of her.

*Id.* at 504, 144 S.E.2d at 482.

We found the argument improper and reversed the conviction and death sentence. Although we did not describe it as a golden rule argument, we explained that

> [a]n argument of this nature addressed to the jury tends to completely destroy and nullify all sense of impartiality in a case of this kind. Its logical effect is to arouse passion and prejudice. Jurors are sworn to be governed by the evidence and it is their duty to regard the facts of a case impersonally. We have no idea that the able Solicitor intended to arouse prejudice or passion. But statements of this character are well calculated to bring about this result.

*White,* 246 S.C. at 506, 144 S.E.2d at 482 (quoting *State v. Gilstrap,* 205 S.C. 412, 32 S.E.2d 163 (1944), where the Court

condemned an argument in a death penalty case in which the solicitor urged jurors to "[p]lace yourself in the position that this girl was your own daughter, and go in and vote as though it were your own daughter who had been raped," but upheld the conviction given the overwhelming evidence of the defendant's guilt).

Other courts, including our own Court of Appeals, uniformly have condemned and prohibited golden rule arguments in criminal and civil settings. *State v. McDaniel,* 320 S.C. 33, 462 S.E.2d 882 (Ct.App.1995) (reversing conviction and remanding for new trial in sexual assault/robbery case where solicitor used "you" or a form of "you" some forty-five times, asking the jury to put themselves in place of the victim); *Forrestal v. Magendantz,* 848 F.2d 303, 309 (1st Cir.1988) (stating golden rule argument is universally condemned and listing factors to determine whether it is reversible error); *U.S. v. Teslim,* 869 F.2d 316, 328 (7th Cir.1989) (holding it is improper for prosecutor to urge jurors to place themselves in party's shoes); *State v. McHenry,* 276 Kan. 513, 78 P.3d 403, 410 (2003) (golden rule arguments are not allowed because they encourage jury to depart from neutrality and decide case on improper basis of personal interest and bias); *Caudill v. Commonwealth,* 120 S.W.3d 635, 675 (Ky.2003) (prohibited golden rule argument is one in which prosecutor asks jurors to imagine themselves or someone they care about in position of crime victim); *Garron v. State,* 528 So.2d 353, 358–360 (Fla. 1988) (prosecutor's golden rule arguments during penalty phase of capital case, taken as a whole, demonstrated classic case of attorney who has overstepped bounds of zealous advocacy and entered into forbidden zone of prosecutorial misconduct, requiring new trial); *State v. Carlson,* 559 N.W.2d 802, 811–812 (N.D.1997) (golden rule argument is improper and should be avoided in civil and criminal actions, but brief comment in prosecutor's rebuttal argument did not constitute reversible error); *Hayes v. State,* 236 Ga.App. 617, 512 S.E.2d 294, 297 (1999) (an improper golden rule argument asks jurors to consider case, not objectively as fair and impartial jurors, but rather from biased, subjective standpoint of litigant or victim).

We reject the State's assertion that a golden rule argument, grounded in the facts of a particular case, is permissible in

light of *Payne.* In that case, the United States Supreme Court held that states may allow the admission of victim impact evidence in capital cases without violating the Eighth Amendment, provided such evidence is not so unduly prejudicial that it renders the trial fundamentally unfair and violates due process under the Fourteenth Amendment. "A State may legitimately conclude that evidence *about the victim* and *about the impact of the murder on the victim's family* is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne,* 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736 (emphasis added). Thus, it was proper in a brutal murder case for the grandmother of a child victim to testify the child missed his murdered mother, and it was proper for the prosecutor to discuss the continuing effect of the crime on the child victim and his family during the penalty phase of the trial.

■ However, consideration of victim impact evidence does not open the door to golden rule arguments urging the jury to subjectively analyze a case solely or primarily from the victim's viewpoint. *Payne* allows a prosecutor to call upon jurors to consider *objectively* a victim's uniqueness as an individual and impact of the crime on the victim's family. The *Payne* Court did not approve the use of golden rule arguments in a capital case.

The State's reliance on a North Carolina line of cases is similarly misplaced. Those cases prohibit arguments in which jurors are urged to put themselves in the victim's position, but allow a prosecutor to use evidence admitted at trial to describe vividly a victim's waning moments of life to the jury during the penalty phase of a capital case. *E.g. State v. Miller,* 357 N.C. 583, 588 S.E.2d 857, 867 (N.C.2003); *State v. Anthony,* 354 N.C. 372, 555 S.E.2d 557, 591–593 (2001). Furthermore, the California Supreme Court in *People v. Haskett,* 30 Cal.3d 841, 180 Cal.Rptr. 640, 640 P.2d 776 (1982), cited by the State, did not endorse golden rule arguments. "[I]rrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed," although the "prosecution's invitation to the jurors to project themselves into the role of the surviving victim in this case was insufficiently inflammatory to justify reversal." *Id.* at 790.

 Petitioner has shown error under the *Strickland* standard. His attorney erred in failing to object to the solicitor's explicit call for jurors to "put yourself in Margaret's shoes, size six." The argument indisputably asks jurors to abandon their impartiality and view the evidence and potential sentence from Victim's viewpoint. As we recognized in *White*, 246 S.C. at 506, 144 S.E.2d at 482, jurors should decide whether to recommend a death sentence based on an impartial, rational, and careful evaluation of all the facts and circumstances about the crime, the victim, and the defendant as presented at trial. Jurors must not strive—or be urged to strive—to analyze the evidence and potential sentence solely or primarily through the eyes of the victim.

 It is difficult to determine the precise impact of the solicitor's argument on the jury's deliberation of the sentence, but the potential impact must be carefully and thoroughly evaluated in a capital case. *See White*, 246 S.C. at 507, 144 S.E.2d at 483 ("[i]n view of the absolute discretion of the jury with regard to the issue of mercy, it is impossible to determine whether the argument actually had a prejudicial effect upon the verdict"); *State v. McClure*, 342 S.C. 403, 409, 537 S.E.2d 273, 275 (2000) ("We note the evaluation of the consequences of an error in the sentencing phase of a capital case [is] more difficult because of the discretion that is given to the sentencing jury. A capital jury can recommend a life sentence for any reason or no reason at all.").

Our studied review of the record leads us to conclude that, while Petitioner has shown error, evidence of probative value supports the PCR judge's ruling that Petitioner failed to demonstrate prejudice under the facts of this case. Petitioner has not shown there is a reasonable probability that, but for counsel's error, the result of the trial's penalty phase would have been different. The solicitor's single comment, although improper, did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Cf. State v. Gaskins*, 284 S.C. 105, 119, 326 S.E.2d 132, 141 (1985) (solicitor's comment during closing argument in capital case that certain evidence was undisputed because of defendant's failure to testify was harmless error beyond a reasonable doubt in context of entire record and in light of overwhelming evidence of guilt), *overruled on other grounds by State v. Torrence*, 305

S.C. 45, 406 S.E.2d 315 (1991). Nonetheless, we strongly disapprove of such arguments because their only possible use is to improperly arouse the passions and prejudices of jurors, urging them to abandon their sworn role as fair and impartial arbiters of the facts and view the evidence from an improper perspective.

## CONCLUSION

We reverse the PCR judge's ruling on Question I because Petitioner has shown error and prejudice stemming from his attorneys' failure to adequately prepare and present expert testimony during the trial's penalty phase about Petitioner's alleged major mental illness as it existed at the time of the murder. We affirm the PCR judge's ruling on Question II because, while Petitioner has shown trial counsel erred in failing to object to the solicitor's improper closing argument, he has not shown the single comment prejudiced him. We remand this case to circuit court for a new sentencing proceeding.

**REVERSED.**

TOAL, C.J., and PLEICONES, J., concur. WALLER, J., dissenting in part and concurring in part in a separate opinion in which MOORE, J., concurs.

Justice WALLER, dissenting in part and concurring in part:

I concur with the majority opinion's analysis of Issue 1. I also concur with the majority to the extent it holds the solicitor's closing argument, asking the jurors to place themselves in the victim's shoes, was improper. I disagree, however, with the majority's conclusion that Von Dohlen was not prejudiced by the solicitor's argument.

The majority cites *State v. White*, 246 S.C. 502, 507, 144 S.E.2d 481, 483 (1965), for the proposition that "[i]n view of the absolute discretion of the jury with regard to the issue of mercy, **it is impossible to determine whether the argument actually had a prejudicial effect upon the verdict.**" (emphasis added).

Given that this is a capital trial in which the jury may recommend a sentence of life for any reason or no reason, I would hold Von Dohlen was prejudiced by the solicitor's improper golden rule comment. Accordingly, I would reverse this issue as well.

MOORE, J., concurs.