# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Susan Tappeiner, Petitioner,

v.

State of South Carolina, Respondent,

Appellate Case No. 2013-001885

---

## ON WRIT OF CERTIORARI

---

Appeal from Beaufort County
The Honorable Perry M. Buckner, III, Circuit Court
Judge

---

Opinion No. 27632
Submitted March 15, 2016 – Filed May 4, 2016

---

## REVERSED

---

Tara Dawn Shurling, of Law Office of Tara Dawn
Shurling, PA, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, and Assistant
Attorney General J. Rutledge Johnson, both of Columbia,
for Respondent.

---

**JUSTICE HEARN:** A Beaufort County jury convicted Susan
Tappeiner of criminal sexual conduct (CSC) with a minor, second degree.
Tappeiner withdrew her direct appeal and filed an application for post-conviction

relief (PCR), asserting, *inter alia*, that her trial counsel was deficient in failing to object to the State's improper remarks during closing arguments. The PCR court denied her relief, finding that although trial counsel was deficient in failing to object, Tappeiner was not prejudiced by the deficient performance. We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

In February 2009, Victim informed his school resource officer that he was sexually assaulted by Tappeiner, his forty-two year old neighbor. Victim stated the assault happened in August 2008, approximately seven weeks before his fourteenth birthday.

According to Victim, on that August night, he went to Tappeiner's house with his sister and a neighbor to watch movies with Tappeiner, her husband, and their two daughters while his parents were out of town. Tappeiner and her husband were drinking alcohol during the movies, although neither was noticeably intoxicated. By the end of the last movie, all of the children except Victim had fallen asleep in front of the television, and Tappeiner's husband had gone upstairs to bed. Tappeiner briefly left the room where the children lay sleeping, then reentered and began fondling Victim's penis. When he resisted, Tappeiner pulled Victim upstairs into her daughter's bedroom, where she forced him to perform oral sex on her, as well as engage in vaginal intercourse. Although Victim stated he screamed for help, apparently no one heard him or woke up. Eventually, Victim was able to escape and return home.[1]

Tappeiner was arrested and indicted for CSC with a minor, second degree. From the outset of the trial, both parties acknowledged there was no physical evidence of the alleged crime, and therefore the case was entirely dependent on a credibility determination between Victim and Tappeiner. The State presented

---

[1] During the police investigation into Victim's allegations, Tappeiner voluntarily went to the police station and made a statement in which she confessed she had sexual intercourse with Victim. However, after the *Jackson v. Denno*, 378 U.S. 368 (1964), hearing the trial court granted Tappeiner's motion to suppress, finding the statement involuntarily-made based primarily on expert testimony that Tappeiner was heavily abusing alcohol and Klonopin, an antianxiety drug, at the time she made the statement. According to the testimony, Klonopin is a powerful tranquilizer that may cause side effects such as dizziness, nausea, blurred vision, poor judgment, lack of balance and coordination, sleep disturbances, amnesia, forgetfulness, fainting, or seizures.

testimony from Victim, the school resource officer, two police officers, and a counselor at a local rape crisis center, who was qualified as an expert witness in forensic interviewing. Notably, although the rape crisis counselor interviewed Victim after he reported the assault, she did not testify as to that interview, instead merely addressing the solicitor's hypothetical questions as to why child victims of sex crimes may delay reporting the abuse. In an effort to corroborate Victim's story as to the details of the assault, the State introduced the dress and panties that Tappeiner allegedly wore during the attack because both articles of clothing were very distinctive. However, both items were clean and did not contain any DNA evidence.

In Tappeiner's defense, trial counsel called one witness—Tappeiner's husband. He testified that on the night in question, he accompanied his wife to bed at the end of the last movie, he slept with her all night, and she did not leave the bed for any reason. He stated his wife was "a little loopy" from the combination of her antianxiety medication and alcohol, and likely was not able to remember anything that occurred that night. However, he recalled that his wife was not wearing the clothing Victim described. Further, Tappeiner's husband asserted he was a light sleeper, and their house is small, such that he definitely would have heard Victim if he had yelled out, as alleged, that night. Moreover, Tappeiner's husband testified one of their dogs was "very protective and would have barked" at any loud noises, such as if Victim had shouted. Tappeiner's husband further stated that when he awoke the following morning, Victim was still sleeping in the living room with the other children, and when Victim awoke, he acted completely "normal," entering the kitchen to have breakfast with him. Finally, Tappeiner's husband testified that prior to Victim reporting the assault, several neighbors informed the couple that Victim and his sisters were using the Tappeiners' hideaway key to enter their home without their permission, which could explain how Victim was able to describe the articles of clothing in question.[2]

During closing arguments, trial counsel asserted "[t]here's no scientific evidence here. There's no semen. There's no DNA." Citing repeatedly to Tappeiner's husband's testimony, trial counsel discussed the discrepancies between the version of events offered by Victim and the husband, such as Tappeiner not

---

[2] According to Tappeiner's husband, at some point after the night of the alleged assault, Tappeiner hired Victim's sisters to babysit for her daughters after school and provided them with the location of her hideaway key. However, Tappeiner later fired the sisters after learning of the sisters' and Victim's entry into her house at times when the sisters were not babysitting.

wearing the described clothing on the night in question, and that she slept with her husband all night after the last movie ended. Moreover, trial counsel pointed out that Victim's story was unlikely, as the house was small and someone would have heard him screaming; he remained in the house after the alleged assault and had breakfast with Tappeiner's husband the next morning like normal; and, given the disparity in sizes between Victim and Tappeiner, Tappeiner would have been unable to physically drag him upstairs if he was resisting. Trial counsel then criticized the rape crisis counselor's testimony, stating "she gave no information that was really specifically related to [V]ictim." Finally, trial counsel also reminded the jury that Victim had unauthorized access to the Tappeiner house via the hideaway key.

By contrast, the solicitor reiterated that this case centered on credibility. After stating to the jurors that "Victim looked [them] in the eye" to aid them in their credibility determination, the solicitor summarized the relevant testimony. First, the solicitor reminded the jury of the colloquy in which the solicitor explicitly asked the school resource officer if he believed Victim's story, to which the officer "said, yeah. Yes."[3] The solicitor then asserted the rape crisis counselor likewise interviewed Victim "face to face, eye to eye," and she believed his version of events as well. Specifically, the solicitor stated, "I think the expert told you that she has done over 200 forensic interviews. Folks, these are people who can detect when someone is making something up or if there is nothing there." The solicitor then reminded the jury that the police interviewed Tappeiner "face to face, eye to eye," and that she was charged the same day with CSC with a minor, second degree.

In concluding, the solicitor repeatedly argued that Victim made consistent statements throughout his "eye to eye, [] face to face discussions" with the various witnesses, and that the jury should "think about the eye to eye, face to face interviews that victim has had with law enforcement and the expert[]." As her final statement to the jury, the solicitor asserted that in making their decision, the jurors should consider "would you let [Tappeiner] babysit your kids? Your grand kids

---

[3] Trial counsel objected to this line of questioning during trial, arguing that the testimony improperly bolstered Victim's testimony. However, he did not renew this objection when the solicitor reiterated this testimony during closing arguments. We note the trial court improperly admitted the initial testimony. *See State v. Kromah*, 401 S.C. 340, 358–59, 737 S.E.2d 490, 500 (2013) (stating that in child sex abuse cases, "it is improper for a witness to testify as to his or her opinion about the credibility of a child victim").

[sic]? Nieces and nephews? I think the answer to that is why you should find her guilty."

Ultimately, the jury found Tappeiner guilty of CSC with a minor, second degree, and the trial court sentenced Tappeiner to ten years' imprisonment, suspended on the service of five years' imprisonment and three years' probation.[4] The trial court also informed Tappeiner she would be placed on the sex offender registry for life.

Tappeiner elected to abandon her direct appeal due to preservation problems and proceeded to post-conviction relief. PCR counsel then filed an application for PCR, asserting twenty-seven grounds for relief.

The PCR court denied relief on all counts. However, in its order, the court only made specific findings on four of the twenty-seven grounds, including, *inter alia*, that trial counsel was deficient in failing to object to the State's allegedly improper remarks during closing argument. However, the PCR court found that trial counsel's deficiencies did not prejudice Tappeiner.

The State and Tappeiner filed cross-motions to alter or amend pursuant to Rule 59(e), SCRCP. The State requested the PCR court reconsider its findings that trial counsel was deficient. Tappeiner argued, *inter alia*, that the PCR court failed to make factual findings or conclusions of law on twenty-three of her twenty-seven allegations of ineffectiveness as required by law, and requested that the PCR court make such findings. *See* S.C. Code Ann. § 17-27-80 (2014) (stating the PCR court must make specific findings of fact and rulings of law).

In response, the PCR court issued an amended order that was identical in all respects to the initial order, except at the end, it listed the allegations by number and inserted an identical paragraph under each allegation, stating:

> [Tappeiner] fails to carry her burden in proving (1) that her counsel failed to render reasonably effective assistance under prevailing professional norms, and (2) that she was prejudiced by her counsel's ineffective performance. Further, even if this [c]ourt were to find a deficiency in [trial counsel's] representation, any such deficiency did not prejudice the defense in that this [c]ourt does not conclude from reviewing the evidence that by a preponderance of the evidence the result of the trial would have been different.

---

[4] Thus, at the time of this appeal, Tappeiner is no longer in prison.

Tappeiner made a second motion to alter or amend, asserting the PCR court's order still did not comply with the requirements set forth in section 17-27-80. However, the PCR court denied the motion.

We granted Tappeiner's petition for a writ of certiorari to review the PCR court's decision.

## ISSUE PRESENTED

Did the PCR court err in failing to find that trial counsel's failure to object during the State's closing argument constituted prejudicial error?

## STANDARD OF REVIEW

In PCR actions, an appellate court will uphold the lower court's findings if there is any evidence of probative value that supports the findings. *Cherry v. State*, 300 S.C. 115, 119, 386 S.E.2d 624, 626 (1989). However, the Court will reverse the PCR court's decision if it is controlled by an error of law. *Pierce v. State*, 338 S.C. 139, 145, 526 S.E.2d 222, 225 (2000). "The burden of proof is on the applicant to prove his allegations by a preponderance of the evidence." *Frasier v. State*, 351 S.C. 385, 389, 570 S.E.2d 172, 174 (2002) (citing Rule 71.1(e), SCRCP).

Generally, in supporting any allegations of ineffective assistance of counsel, a PCR applicant must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the applicant must demonstrate that trial counsel's performance was deficient. *Cherry*, 300 S.C. at 117, 386 S.E.2d at 625. "Under this prong, 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688) (internal alteration marks omitted); *see also Franklin v. Catoe*, 346 S.C. 563, 570–71, 552 S.E.2d 718, 722 (2001) (stating that the applicant must demonstrate that trial counsel's performance fell below an objective standard of reasonableness).

Second, the applicant must demonstrate that trial counsel's "deficient performance prejudiced the [applicant] to the extent that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Cherry*, 300 S.C. at 117–18, 386 S.E.2d at 625

(quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Smith v. State*, 386 S.C. 562, 566, 689 S.E.2d 629, 631 (2010).[5]

Courts must strongly presume that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Edwards v. State*, 392 S.C. 449, 456, 710 S.E.2d 60, 64 (2011). Thus, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

## LAW/ANALYSIS

Tappeiner argues trial counsel was ineffective for failing to object to the numerous instances in the State's closing argument in which the solicitor vouched for Victim's credibility by implying the police and rape crisis counselor believed Victim, and not Tappeiner. Tappeiner further contends trial counsel was ineffective for failing to object when the solicitor appealed to the jurors' emotions by asking them if they would want Tappeiner babysitting their own children and relatives. The PCR court found trial counsel's failure to object on both issues was deficient, but found these errors were not prejudicial to Tappeiner, stating only that

---

[5] Upon reaching a decision, the PCR court is required to "make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented" in a PCR application, including whether the applicant satisfied his burden as to each prong of the *Strickland* test described above. S.C. Code Ann. § 17-27-80; *see also Marlar v. State*, 375 S.C. 407, 408, 653 S.E.2d 266, 266 (2007) (per curiam); *McCray v. State*, 305 S.C. 329, 330, 408 S.E.2d 241, 241 (1991). Here, the PCR court failed to comply with these requirements, dealing with twenty-three of the twenty-seven grounds for relief in a summary fashion and making no factual findings on those issues whatsoever.

Ordinarily, when the PCR court makes inadequate factual findings, we remand the matter to the PCR court for a new hearing. *See Pearson v. Harrison*, 9 Fed. App'x 85, 87 (4th Cir. 2001) (per curiam) ("[T]he South Carolina Supreme Court has consistently vacated and remanded PCR court judgments that do not contain findings on issues presented to the PCR court . . . ." (collecting South Carolina Supreme Court cases) (citations omitted)). Here, however, we find the PCR court should have granted Tappeiner relief on one of the very few issues it did make specific findings on—trial counsel's failure to object during the State's closing argument. Thus, we find that a remand in this case is unnecessary.

it did "not believe from the evidence presented there exist[ed] a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." We agree counsel's performance was deficient, but find, contrary to the PCR court's conclusion, that these deficiencies prejudiced Tappeiner.

Generally, "[t]he assessment of witness credibility is within the exclusive province of the jury." *State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct. App. 2012) (citing *State v. Wright*, 269 S.C. 414, 417, 237 S.E.2d 764, 766 (1977)). Thus, solicitors may not vouch for a witness's credibility, as doing so improperly invades the province of the jury and places the government's prestige behind the witness. *Vaughn v. State*, 362 S.C. 163, 169, 607 S.E.2d 72, 75 (2004) (citing *State v. Shuler*, 344 S.C. 604, 630, 545 S.E.2d 805, 818 (2001)) (stating that a solicitor improperly vouches for a witness's credibility "by making explicit personal assurances, or indicating that information not presented to the jury supports the testimony"); *Matthews v. State*, 350 S.C. 272, 276, 565 S.E.2d 766, 768 (2002). Thus, solicitors must confine their closing remarks to the record and the reasonable inferences that may be drawn therefrom. *Simmons v. State*, 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998).

In keeping their closing arguments within the record, solicitors additionally must tailor their remarks "so as not to appeal to the personal biases of the jury" or "arouse the jurors' passions or prejudices." *Von Dohlen v. State*, 360 S.C. 598, 609, 602 S.E.2d 738, 744 (2004). Accordingly, solicitors should avoid comments that ask jurors to place themselves in the victim's—or another party's—shoes, because those types of comments tend to "'completely destroy all sense of impartiality of the jurors.'" *Brown v. State*, 383 S.C. 506, 515–16, 680 S.E.2d 909, 914 (2009) (quoting *State v. Reese*, 370 S.C. 31, 38, 633 S.E.2d 898, 901 (2006)).

In assessing the propriety of remarks made during the State's closing argument, appellate courts must determine "whether the solicitor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Vaughn*, 362 S.C. at 169–70, 607 S.E.2d at 75 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *Von Dohlen*, 360 S.C. at 609, 602 S.E.2d at 744; *cf. Dawkins v. State*, 346 S.C. 151, 157, 551 S.E.2d 260, 263 (2001) (stating that testimony that improperly corroborates a child sex victim's testimony has a devastating impact because of the cumulative effect of repeating the victim's testimony, and thereby improperly bolstering the victim's credibility). As a result of this inquiry, courts may occasionally apply the "invited reply" doctrine, and find that although a solicitor's closing argument was inappropriate, it was responsive to

statements or arguments made by the defense, and thus did not deny the defendant due process.  *Vaughn*, 362 S.C. at 169, 607 S.E.2d at 75.

Here, we find trial counsel's closing argument did not invite the solicitor to repeatedly assert that the State's witnesses all believed Victim's version of events after their "face to face, eye to eye" interviews with him.  Rather, trial counsel's presentation pointed out inconsistencies in the stories, which could do no more than invite the solicitor to point out the contradictory aspects of Victim's story and the other witnesses' testimony.

Moreover, some of the solicitor's statements regarding Victim's credibility were not only damaging to Tappeiner, but misrepresented the evidence adduced at trial, such as the solicitor's statement that the rape crisis counselor personally interviewed Victim, and that she is someone "who can detect when someone is making something up or if there is nothing there."  The rape crisis counselor *never testified in front of the jury that she interviewed Victim herself.*[6]  Rather, she only answered the solicitor's hypothetical questions about why a child victim might delay reporting.  Thus, the solicitor's statements were clearly improper and objectionable.  *See Matthews*, 350 S.C. at 276, 565 S.E.2d at 768 ("Vouching for a witness based on outside material conveys the impression to the jury that the solicitor has evidence not presented to the jury but known by the prosecution which supports conviction.").  Accordingly, we find there is evidence in the record to support the PCR court's finding that trial counsel was deficient in failing to object to the solicitor's repeated vouching for Victim's credibility.

Further, the solicitor's remarks regarding whether the jurors would want Tappeiner babysitting their children or relatives improperly appealed to the jurors' emotions, rather than the evidence in the record.  *Cf. Brown*, 383 S.C. at 512, 517, 680 S.E.2d at 912, 915 (finding the solicitor improperly appealed to the jurors' emotions during closing argument when telling them to "speak up" for the child victim and "make sure that the perpetrator is punished").  Thus, we further find there is evidence in the record to support the PCR court's finding that trial counsel was deficient in failing to object to the solicitor's emotional appeal at the conclusion of its closing arguments.

---

[6] At best, during cross-examination, trial counsel had her read from her "report" that Victim testified that he yelled during the attack, but that no one heard him. However, it was never explained to the jury what this report was, or whether she had created it by actually talking to Victim herself.

The PCR court found neither of these deficiencies prejudiced Tappeiner, although it did not specify its reasoning, merely stating that the other evidence in the record supported Tappeiner's conviction. Indeed, in determining prejudice, we frequently consider whether there is other direct or circumstantial evidence supporting the conviction, notwithstanding trial counsel's deficient performance. *See Brown*, 383 S.C. at 518, 680 S.E.2d at 916 (finding that the solicitor's improper appeal to the jury's emotions was not prejudicial in light of the fact that there were four unrelated, adult witnesses to the defendant's rape of the child victim, as well as other direct evidence that a rape occurred); *Simmons*, 331 S.C. at 338, 503 S.E.2d at 166 (stating that appellate courts must consider the impropriety of the solicitor's argument in the context of the entire record, including whether there is overwhelming evidence of the defendant's guilt).

Here, as the parties freely admitted during trial, the case was entirely dependent on a credibility determination between the prosecution's witnesses and the defense's witness. Given the dearth of evidence beyond Victim's assertions, we cannot say evidence of Tappeiner's guilt was overwhelming. Therefore, we find that but-for the improper vouching for Victim's credibility, there is a reasonable likelihood the outcome of the trial would have been different, and Tappeiner was thus prejudiced by trial counsel's failure to object. *Cf. State v. Jennings*, 394 S.C. 473, 480, 716 S.E.2d 91, 94–95 (2011) ("There was no physical evidence presented in this case. The only evidence presented by the State was the children's accounts of what occurred and other hearsay evidence of the children's accounts. Because the children's credibility was the most critical determination of this case, we find the admission of the written reports was not harmless."); *Dawkins*, 346 S.C. at 157 n.7, 551 S.E.2d at 263 n.7 ("This strategy [of improperly corroborating Victim's version of events] was inappropriate especially given the fact there was no overwhelming evidence that petitioner sexually abused Chambless.").[7]

_____

[7] *See also, e.g., Vaughn*, 362 S.C. at 170, 607 S.E.2d at 75 ("Here, *if not for the lack of evidence*, we might agree that the solicitor was merely responding to the petitioner's argument." (emphasis added)); *Matthews*, 350 S.C. at 276–77, 565 S.E.2d at 768 ("The solicitor's summation led the jury to believe the government corroborated the witness'[s] testimony before trial and found it credible. *The solicitor did not support this vouching with anything within the record, such as corroboration by other witnesses or physical evidence.* The solicitor improperly vouched for the witness." (emphasis added)); *cf. State v. Chavis*, 412 S.C. 101, 110–11, 771 S.E.2d 336, 341 (2015) (finding a witness's bolstering of the child victim's testimony harmless because there were witnesses to and physical evidence

Similarly, given the lack of physical evidence, the solicitor's emotional plea that Tappeiner was a bad actor and could not be trusted to watch the jurors' own family members is reasonably likely to have had a substantially stronger impact than would be the case in a trial where there was additional, independent evidence of the defendant's guilt. *See, e.g.*, *Brown*, 383 S.C. at 518, 680 S.E.2d at 916 (finding the improper appeal to the jurors' emotions was not prejudicial when other, overwhelming evidence supported the child victim's assertion that she was raped by the defendant).[8] As a result, we find it likely the emotional plea, particularly in conjunction with the solicitor's improper vouching for Victim's credibility, swayed the jurors' view of the facts and resolution of the contradictions in the witnesses' testimonies.

Accordingly, we find there is no evidence in the record to support the PCR court's conclusion that Tappeiner was not prejudiced by trial counsel's failures to object during the State's closing arguments. To the contrary, the solicitor's repeated vouching for Victim's credibility and her emotional plea to the jurors was incredibly prejudicial to Tappeiner because there was no other evidence beyond Victim's testimony of the events that allegedly occurred that August evening. We therefore reverse the PCR court's finding that trial counsel's failure to object during closing arguments was not prejudicial, and grant Tappeiner a new trial due to ineffective assistance of counsel.[9]

---

of the rape, and therefore the case did not turn solely on the child victim's credibility (citations omitted)).

[8] Moreover, the emotional plea was the very last thing the jury heard before beginning its deliberations, and connected the jurors personally to the alleged abuse in the case. Thus, the comment was likely at the forefront of the jurors' minds when beginning their discussions.

[9] Tappeiner raises two other issues on appeal, including whether the PCR court erred in failing to find prejudice in trial counsel's failure to object to the State's references to Tappeiner's suppressed confession, and whether the PCR court erred in failing to find trial counsel ineffective for failing to adequately prepare and present a defense on Tappeiner's behalf. However, because the closing argument issues are dispositive, we decline to address the remaining issues on appeal. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).

## CONCLUSION

Based on the foregoing, we reverse the PCR court and grant Tappeiner a new trial.

**REVERSED.**


**PLEICONES, C.J., BEATTY, KITTREDGE and FEW, JJ., concur.**